Case number 16-5379, Dana Farber Cancer Institute v. Thomas E. Price, Secretary, United States Department of Health and Human Services Appellant, Ms. Zubrecki for the Appellant, Mr. Hallward-Drymer for the Appellate. Good morning. Good morning. May it please the Court, Carlene Zubrecki on behalf of the Department of Health and Human Services. HHS properly determined that the cost that Dana Farber incurred in connection with the Massachusetts tax was the amount of the payments that Dana Farber actually made to the state of Massachusetts. What plaintiffs are asking for in this case is Medicare reimbursement for more than the amounts of the payments that they actually made. If there were two different accounts, would your position be different? No. In this case, it's not a question of sort of the specific accounts. It is a question of the way that, you know, the state of Massachusetts has chosen to impose this tax specifically to fund these payments back to the hospitals. I mean, it's a totality of the circumstance test, but in this case, you know, the money is, the tax exists to fund exactly this type of payment back to the hospitals. Why do you reimburse the tax to begin with? In general, you know, HHS- Given that the tax, as you say, is solely to provide funds for Medicaid patients, then why is it a reimbursable cost in the beginning? Sure. To the extent that it's something that's collected by the state of Massachusetts and sort of is incurred as a cost for the hospital and is then sort of redistributed, it's considered one of the general overheads of running a hospital, that the secretary has generally reimbursed this tax. But why? I mean, you say in your brief, page 30, the secretary is not permitted to use Medicare funds to reimburse hospitals for Medicaid costs. Yes. And isn't this whole tax a Medicaid cost? Again, you know, whether this whole tax is reimbursable has not been disputed in this case. And that really gets to my concern about the government's position. It seems that you really have problems with the idea of reimbursing this tax in the first place but are doing it through kind of a backdoor of peeling off the Medicaid part of it. I don't think that's exactly right, Your Honor. You know, let me, if I can make an analogy. I mean, if the state of Massachusetts assessed a tax and then allowed a deduction based on the cost of paying for low-income indigent patients, there's no question that the hospital's tax costs would reflect that deduction. What the secretary did here was basically construe this transaction as being functionally identical to that transaction. And I think it is functionally identical to that transaction. And, you know, there's certainly nothing in the Medicare statute or regulations that requires the secretary to distinguish between that type of a deduction and a circumstance where Massachusetts simply collects the tax and then hands it back to the hospitals as sort of a redistribution. Of course, Massachusetts does not structure it that way, however, because the quote-unquote deduction can actually greatly exceed the amount of the tax. Well, so I guess the analogy would be to a refundable tax deduction. But I think that the analogy still holds. I mean, again, Massachusetts does structure it that way, which allows it to obtain additional Medicaid funds through an entirely separate program. But the fact that they're doing so has no bearing on the secretary's ability to consider the extent to which the cost is actually incurred for a particular hospital. So the economics of this, I think, are interesting. And you make good points on the functionally similar or identical point, and I take that point. But what about the regulation? Kind of go to the law side of this rather than the economic side of this. The regulation speaks of refunds. The guidance, as I see it, broadens that somewhat. But if we stick with the regulation for a moment, this is not a refund in the traditional sense. Well, I think if you look at what the board did in this case, we understand the board as having applied the general regulatory provisions at 413.9 as opposed to just strictly relying on the refund regulation. So it was interpreting, we think, the statutory language about actually incurred and what it means to actually incur a cost. And, you know, the refund regulations are directed to payments for goods and services. There's no regulation that addresses what to do when a state collects a tax and then hands the tax back to you. And there's no way that the secretary could sort of have regulations that address every single possible circumstance that could be presented, as I think the Supreme Court made clear in the Shigella v. Guernsey case. And so, you know, what the secretary did in this case was acknowledge that. I could easily have put in a regulation about state taxes and something that would cover this circumstance. I mean, the reason that adjudications exist is to address sort of those areas and the interstices of, you know, Medicare reimbursement that haven't been addressed specifically by a regulation. We think it was very reasonable for the secretary to analogize this situation to a refund, to look to the principles embodied in the refund regulation. And I think if you read the board's decision, that's what the board was doing here. Yeah. Go ahead. So let me just ask a quick question. Your brief says our standard of review is de novo, but what is our standard of review sitting in looking at the interpretation by the agency? We think that it's Chevron to the extent that you think it's a question of law and substantial evidence to the extent. Do you think it's a question of law? Well, I think it's actually substantial evidence is the appropriate standard here. I think that what the secretary was doing was applying the actually incurred regulation to. Yes, but he was looking at a phrase, wasn't he? Wasn't the secretary looking at a phrase and interpreting it? Yes, but it was sort of looking at kind of the totality of the circumstances with these taxes. I mean, even if this court considers it a mixed question. I don't understand your analytical framework. That's what I'm trying to ask you to focus on. In terms of the court, are we supposed to just decide for ourselves what we think the interpretation should be or? No, certainly not. So when you're saying it's de novo, you are asking us to apply the traditional Chevron framework? Yes, if it wasn't clear. So is your position that the language is clear or is it ambiguous? Certainly the language is ambiguous. And therefore is the question before us whether the interpretation is permissible. Yes. All right. As distinct from whether it's what we would decide. Yes, that's correct. And I'm sorry if my brief wasn't clear. We meant that it's de novo review of the district court decision in this case. But the review of the board's decision is certainly, we believe, under Chevron or for substantial evidence to the extent you think it's a mixed question. So where do you respond to the challenge that the effect of the interpretation is to impermissibly shift funds? Look, to the extent that this is not a cost that is actually incurred. So, again, to the extent Medicare is reimbursing a hospital for costs that it has not fully incurred, that are the exact equivalent as if it had just held on to that money and then provided care for Medicaid patients, which is the functional equivalent of what happened here. The hospital just held on to money and then provided care for, and I'm sorry, I misspoke there, for low-income patients that Massachusetts provides reimbursement for. The care for those low-income patients would not be considered the sort of overhead cost that Medicare provides reimbursement for as an indirect cost. So Medicare provides reimbursement for general overhead indirect costs. The Secretary has construed that to include tax expenses to the extent that they're kind of distributed throughout the state. Let me ask a question about that. So the board gave an example in its decision of a hospital kind of on getting its monthly tax bill, and its monthly tax bill is $20, but it's going to receive $5 from the trust fund that month for care that it has provided to low-income or underinsured patients, however you want to define that. So let's suppose you had another hospital that also owed $20 that month because it basically provides the same proportion of, based on the formula of the private services. But it provided no care to underinsured or poor patients that month. So its gross tax liability and its net tax liability is going to be the same. It's going to be $20. Yes. So to the extent that those two hospitals both apply for Medicare reimbursement, the one that provides no care gets the full $20 reimbursed, right? So just as a factual clarification there, we're kind of at the first step of a two-step process here. So the cost on which their reimbursement would be based would be the full $20, but Medicare itself would only reimburse the hospital for a proportion of that $20. Right. That's different from his question. But I just want to say. So I guess what I'm trying to get at is if you have two hospitals and they both pay $20 that month, one provides care to underinsured patients and the other one doesn't, the one that's providing the care to the underinsured patients may get $5 from the trust fund, but it's not really getting that $5 that it's putting on its general ledger. It's just an offset against its $20 tax liability that month, right? So I guess all I'm saying is that at the end of the day, the hospital that is providing the care to the underinsured patients, if their Medicare reimbursement is being offset by that $5, when do they ever kind of realize the benefit of that $5? So I think that this actually does go to the clarification I was trying to make just a second ago, which is the state is going to make payments, say, the $5 back to the hospitals. What Medicare will reimburse hospitals for, the amount that Medicare will actually reimburse them, is a proportion of their incurred costs, so a proportion of the $15. So what I'm saying is that a hospital that provides this care, you know, is still coming out ahead from if they hadn't received a payment from the state of Massachusetts at all. So to the extent that there's sort of this atmospheric that what the Medicare reimbursement here is doing. And explain to me exactly how they come out ahead. Because they don't get the $5. The $5 is just, you know, they get a bill that says instead of you owe $20, but instead of putting $20 into your trust account, just put $15 in and we'll call it even. Right. So in that sense, they don't get the $5 ever, right? Well, no, I mean, sure, it's offset. And again, to be clear, under Massachusetts regulations, you know, this payment is made as a net payment at the end of every month. But step back a little. I think we're trying to understand this. You probably understand this totally. And I don't. This is a demonstration project. And following up on Judge Wilkins' question, is the $5 reimbursement viewed, I guess by the Secretary, in terms of an incentive to provide this care for low-income people? And that's what this Massachusetts tax is all about, trying to provide care for people who can't afford it. So that to the extent that Massachusetts has set up the tax to provide that incentive, as it were, that's one way to look at it. But I understand Dana-Farber to be making a sort of different argument that does get to this argument about there are two funds. How do I get my benefit? How do I get my reimbursement for Medicare? And aren't you shifting the cost impermissibly? And that's what I was looking for, the reply in your reply brief, and I didn't see it. Sure. So just to try to take a step back here for a second. What we're talking about here in this case is Medicare reimbursement for hospitals, specific hospitals. Medicaid, totally separately, allows states a huge amount of flexibility to sort of structure their tax systems and their Medicaid systems and their grants in any number of ways. It imposes certain requirements on them. It does sort of require hospitals to take into account the position of hospitals that provide a disproportionate amount of care for low-income patients and allows states to make those payments in any number of ways. That's the dish payments we're talking about here. So the it in your sentence is what? Medicaid in that sentence. It allows states a great amount of flexibility to do any number of things. I understand that, but we're talking about the Medicare reimbursement. Right. So in this case we're focused on the Medicare reimbursement for hospitals. And the only question that's at issue here is what costs the hospital actually incurred. Massachusetts happens to have set up a system. It actually incurred the cost of the tax, and then it received some money back, as you said, for the totally separate program of Medicaid. I mean, that's at least one way to look at it, and I know your point is going to be economically it all is the same. But in terms of the programs, okay, I'm paying a tax to Massachusetts as a hospital. Medicare is going to reimburse that tax. I get money back for the low-income patients we treat, and that comes from the state. Now, the fact that they do it in one account doesn't strike me as controlling. Again, Your Honor, it's not one account. It's that this tax funds these payments. It is specifically earmarked. It's created in the same statute. Massachusetts, by law, conducts this asset. That's my question about why Medicare pays this in the first place. Again, to the extent that Massachusetts wants to conduct a redistribution between hospitals that provide greater levels of private sector charges via the tax to hospitals that care for more indigent patients, HHS allows them to conduct that redistribution. But from the perspective of a hospital, for instance. As part of this demonstration program? Excuse me? As part of this demonstration program? Yes, yes. That's kind of how the dish payments, the demonstration project payments. So to Judge Wilkins' question, I had the same reaction when I did it all, and the economics of this and the ripple effects are hard to fathom when you're sitting here or even where you are and how this works out. But it seems to me that it's penalizing hospitals that treat low-income patients. The hospital A doesn't treat low-income patients, gets the full 20. Hospital B treats low-income patients, gets 15. Again, the hospitals, the hospital that has treated the low-income patients has not incurred the same extent of the tax. Medicare is looking at the cost of the tax. It's uninterested in whether hospitals are compensated for their care of indigent patients. If I could use sort of a different. Is that clear under the way the Massachusetts program works here? Because it charges the tax based on private patients, which excludes, as I understand it, both Medicare and Medicaid patients? That's my understanding, yes. Right, which is another oddity of this. Medicare is reimbursing when the tax is paid based not on Medicare. Again, to the extent that there might be other issues sort of lurking in the record here, I mean, the question in this case is whether it would be reasonable or permissible for the secretary to construe this tax as operating essentially like a refund. Essentially like a refund. I wanted to get back to that or analogous to a refund or akin to a refund. It doesn't seem akin to a refund in the usual sense of the term, which is more tax was withheld than I actually owe at the end of the year, so I'm going to get a tax refund on tax actually paid because I overpaid. This is not an overpayment in that sense. And that is a separate part of this program, I understand, and happened to Dana-Farber, which was there were some overpayments for some years and they got, quote, refunds. So to the extent what the court is referring to is the specific language of the refund regulation, I would note, again, that we don't think that that's what the board was solely relying on this case. We think that the board was applying the general principles of looking to that regulation as guidance, and we think that that was very permissible for the board to do. But to the extent that, to your larger point, again, I would take the example of any other kind of refundable tax deduction. If I took a deduction for my work expenses, one thing you might say is that I'm being reimbursed for my work expenses. But another thing, if somebody then asked me what is my tax cost at the end of the year, when I told you my tax cost, it would reflect that deduction. So if I pay taxes and I'm also getting Social Security benefits at the end of the year, are the Social Security benefits a refund of my income taxes? Again, you know, I think that that's a fairly far afield hypothetical from what we're talking about here. So I assume the answer to that is no. No, I don't think, frankly, I don't want to, you know, But what we're talking about here is a scheme that is set up as a unified system, essentially redistributing funds from hospitals that relatively care for more private patients to those that pay for more indigent patients. And if you imagine the hospital at the median of both of those, you know, spectrums, a hospital that, you know, incurs a $10 tax and would be entitled to a $10 payment under the, based on the way that the state has chosen to measure these distributions, you know, what would be going on for that hospital is essentially it would just do nothing and it would be exactly the same as if they had just held on to that money and separately treated Medicaid patients. And Medicare does not provide reimbursement for those Medicaid patients. I would also just say that One other question, just hypothetical, which is the state payroll taxes. Could Medicare reduce reimbursement of the hospital's state payroll taxes by the amount paid to the hospital for treating the Medicaid patients? Again, that's very different than what we're talking about here. Okay, and let me zero right in on that. Why is it very different? Because if a payroll tax were imposed on hospitals for the express purpose of funding payments back to those precise hospitals, then, you know, it might be appropriate under the logic here. I don't want to, you know, I don't know what all of the details of that hypothetical would be. But what we're talking about here is a tax that exists in this, you know, unified system to take money in and then hand it back to hospitals. And doing it that way To summarize your position, it's because the tax is solely used to compensate hospitals for low-income patients. For uncompensated care. I mean, I think it's because, you know, the relationship between this tax and these payments is that the payments are funded by the tax. Now, as the board, you know, explained, there are minor exceptions. There's the little demonstration projects, which is, you know, $5 million of the many millions of dollars. But the overall structure of this is this is a tax that's collected, put into a pool, and handed back to the hospitals. Except in this case It's intricately intertwined. Why don't we hear from Apelli, and then we'll give you some time on rebuttal. Thank you. Thank you, Your Honor. Doug Halbergema on behalf of Dana-Farber. To hear the Secretary tell it, Council used phrases like payments back to the hospitals, collects the tax, and hands the tax back to you for the express purpose of returning the money back. If this statute was designed for that purpose of basically running a scam to revolving door, get the money back, it's the most poorly designed scam ever. No, there's no allegation it's a scam. All right? The question, no, seriously. The question is, and that's why I spent some time on it, whether this interpretation is permissible. That's right, Your Honor. All right? And so you posit this two scheme theory, and this inappropriate burden on Medicare for activities that the hospital is doing for Medicaid. That's right. And my question is whether or not Ford's interpretation is permissible given this demonstration program where the sole purpose Massachusetts has is to fund these low Medicare qualified patients. Well, if I may, Your Honor, because it goes to the sole purpose. This fund is not just made up of hospital contributions. In fact, in 2005, in the annual report as part of the district court record, it was not part of the J.A. Just to interrupt, I think that's not the question. It's made up of state taxes and hospital contributions and other sources, but the sole purpose for which that fund is then used is uncompensated care. Is that correct? The beneficiaries of the fund, those who receive payments back, are not limited to the hospitals that contribute. In fact, correct. It's hospitals that treat or medical providers that treat uncompensated care, low-income Medicaid patients. And community health centers don't contribute anything in tax. They make no contribution to the fund, but they get payments from the fund because the payments are compensating them for actual care provided to actual poor, uninsured patients. And the largest contributors to the fund are actually the insurance companies who pay a different tax to the fund. Blue Cross Blue Shield pays over $70 million into the fund and never gets a penny. Harvard Pilgrim pays over $20 million into the fund and never gets a penny. Can I follow up on Judge Rogers' question about the law here and what we're doing on the law? So question one, do you think the guidance, the offset guidance, is consistent with the regulations? Well, I think it is if one treats as controlling the statement in the guidance that says that if it's associated with the payment such that it's specifically to reimburse to the hospital the tax or part of the tax. But the next sentence, the word specifically, as you're well aware, is not in that next sentence. And the Sixth Circuit relied on that omission there. I know, but in terms of do I think that the guidance is consistent with the regulation, I think it's consistent with the regulation to the extent that you think the Secretary meant what the Secretary said when they included the word specifically. Suppose we read the guidance not to require the word specifically. Then I think it does not comport with the regulation or the statute. And then what do we do? Then you would have to set it aside as not subject to Chevron deference because it's not consistent. Where are you saying Chevron deference? Our deference. Well, because we think that it's not even consistent with the statute. The statute calls upon the Secretary to reimburse costs that are actually incurred and says that the Secretary has to adopt regulations that are consistent with general principles of cost reimbursement. But your argument, I didn't see anywhere in your brief where you argued that the regulation should be struck down or set aside. I don't think the regulation should be. I think the regulation requires it. So when Nader sends the regulatory text, to follow up on Judge Wilkins' question, and on the regulatory text they say you don't look only at the refund regulation. You look at 413.9 as well. Well, the board specifically said it twice on pages 49 and 50 of the joint appendix. The board finds that the payments are properly treated as refunds. They specifically say refunds twice, and that's the regulatory language. But they also said that it's not a cost that's actually incurred, and they used the $20, you know, $15 example to say that it's not really, you never really incur the $20 because all that you transfer into your trust account in a hospital is $15. But that's purely the mechanism of it. But they say relying on regulation at 413.9, that that's how they're interpreting what actually incurred means. Well, they use the word refund, then they cite 413.9, and then they cite .98 and the definition of refund. And the statute doesn't have, or the regulation, rather, doesn't have the sort of free-floating notion of associated with. And if it did, it would be arbitrary and capricious, I think, because it can't account for the thermometer example that we gave, which is, you know, you pay $100 for thermometers, but the sales rep happens to be injured and you provide $75 worth of care. You net the two and you only end up paying a check of $25. The $75 is income. The problem, though, is that either you are trying to strike down the regulation or you are saying that this particular application of a valid regulation was a bad application. And so why do I care about whether, you know, this thermometer example, why do I care about that example? All I really care about is this application. And is this application a reasonable application? To the extent that I'm dealing with a bit of a moving target, because sometimes the Secretary says the regulation, sometimes the Secretary says the statute, sometimes the Secretary says refund, sometimes the Secretary says, well, just generally. To the extent that the Secretary is purporting to apply the regulations, it is inconsistent with the regulations in their text. The regulations call for not just any association with, but a particular association with. It's one that's contingent on the initial purchase. A refund, you can't have a refund unless you first had a purchase. And I'm not talking about just temporarily. I'm just talking about conditionality. The one depends on the other. But here the payments that are received from the pool do not in any way depend on tax having been paid. The community health centers receive payments from the pool, though they've paid no tax. The Boston Medical Center received in 2006 160 million in payments from the pool. What about the language in 41398 that refunds are amount paid back or credit allowed on account of an overcollection? On account of. That's because of. The conditionality is right there in the text, Your Honor. Whereas what we have here are two separate. You would say this is not an overcollection, obviously. It's not an overcollection. And, in fact, one of Your Honor's questions, Judge Wilkins, was on how it's booked. And your instinct that it should be booked as income is exactly right. And at the joint appendix at 114, the hospital's witness testified that it is treated as income, patient revenue, just like revenue from Blue Cross Blue Shield or Cigna or Aetna that's paying for the canner. The trust fund payment is booked as income. The trust fund payment is booked as income because it's compensating for, it's revenue compensating for specific patient care. And if they didn't, that's part of the problem here is in terms of the inconsistencies that the Secretary's application created. Well, speaking of inconsistencies, why is this a payment that's related to Medicare at all in the first place, a tax payment? Well, it's a payment related to Medicare because it's a tax that is owed by the hospital for doing business. They pay it on all of their private care sector charges, and it's not just one that falls on the hospitals alone. It's a fund that is made up of other sources, including- Why don't they have the, why isn't it just deductible kind of to the extent that, or on some sort of ratio or percentage of how many Medicare patients that the hospital treats? Well, that happens at the second step that counsel was referencing. First, there's the question of, is it an allowable cost? And the second step of it is, what's Medicare's share of that allowable cost? But we're at the first step. Is this an allowable cost to the extent that there was a separate payment that was received that was specifically to compensate for care given to specific individuals? Could Medicare, do you think, say we are rethinking this and we're not going to compensate hospitals at all for the payment of this tax to, in this situation, because the tax is solely used for Medicaid patients? No, the Secretary's longstanding- I understand what the longstanding price is. Could they, under the statute, do that? Your Honor, I have not studied all of those provisions, but my understanding is that the provisions of the statute make clear that if it's a generally applicable tax, it is subject to cost reimbursement under Medicare. And this is because it's not just borne by the hospitals. The private payers pay part of the tax, and it is part of the cost of doing business. Okay, so next hypothetical. Suppose Massachusetts structured this as a deduction, that you pay the tax, but in paying the tax you get a deduction based on the amount of care you provide to Medicaid patients. Your Honor, when the Secretary refers to it as a quote-unquote deduction, it's really wordplay because- I understand wordplay, but just suppose that Massachusetts did the wordplay, not the Secretary. I don't think it would change if it was what they're talking about as a quote-unquote refundable deduction or a refundable tax rate. A refundable tax rate is not a tax deduction. I agree. It's a government payment. Okay, so suppose the deduction were capped at the amount of 50% of the tax. Well, at that point, Your Honor, I think we're getting close to Abraham Lincoln and the other cases in which there was this very direct dependency, conditionality on the tax. You get it back only to the extent of the tax. When you start tying it that way, I think it's fair to say that it is intended to reimburse them for the cost. I think their point, and you heard it, is that if the state could structure it as a deduction and put aside for a second the refundable part of it, which I know is a big part of your argument, why does it matter from Medicare's purposes that they don't structure it as a deduction but do the two-step process that they do here? I think that Judge Rogers' question about shifting Medicare costs to the private patients is actually at the heart of this. And I like the merger example because I think it demonstrates this perfectly. In the merger example, the Secretary acknowledges that the day before the merger, the $20 million or $20 or whatever it is is recognized as reimbursable cost. It was actually incurred, eligible for reimbursement. Medicare pays its share. The day after the merger, however, she says, oh, no, actually because this other entity that you merged with provided all of this care, we love that care to those really poor, uninsured people, but because this other part of your now-merged hospital did that, there's no acknowledgable cost at all. We're not going to pay our share anymore. Well, the cost is still there. The hospital still owes it. Who pays it? Well, the private payers have to pay it, the private patients, and that violates this cost-shifting principle. So in the case that your client is concerned about, does the example used by the board fit or not? I'm sorry. The $20 tax liability. The sense of it being a refund back does not apply. No, no. The issue is it sends you a bill for November. It says you owe $20 million. We're going to pay you $5. So, in fact, only send us $15 million. Well, it is true that the bill says the full $20 million, but it also reflects. But what if you're out of pocket? It was $15. Well, it's really $20 because we're entitled to. No, you haven't paid $20. You haven't paid. I understand your bookkeeping and how accountants can put these in different columns, but what I'm getting at is I thought the board was simply saying all you paid was $15. Yes. The board is applying that sort of mechanical. No, I know, but my point is you can come up with hypotheticals, as you do and others do, that make it very complicated. But the issue here before the board was what it thought fit the example. And I need to be clear as to your position as to why Dana Farmer's situation, of which it is complaining, doesn't fit that example. Whether you call it a deduction, whether you call it a credit, whether you call it a reimbursement, et cetera. But you were out, your client was out $15 million as opposed to $20 million. It is true that there was only $15 million deposited into the account in the hypothetical. That's all your client paid. No, no, Your Honor. Well, in terms of this issue. No, because the other $5 million is something that Dana Farmer is entitled to, and is entitled to it without regard to whether it has tax liability or not. So what you want your client to get really is what? Well, I want them to get, in a sense, credit for the full. No, no, do it in this $20 example. The full $20 is their tax liability. That is their tax cost. And therefore, it should receive. Medicare should treat all of it as allowable cost. $20 million. No, no, it does not receive $20 million. How much should it receive? Well, first of all, that's the cost, but you have to figure out what's the Medicare share of the cost depends upon Medicare utilization. I'm trying to just understand a simple example and why, if in fact, it does not fit your client's situation. Because the board listed all your arguments, and it said, here's an example of how this actually works. And indeed, the way Massachusetts administers the tax, your monthly bill reflects this example. And our point is that the $5 million is income. And if we didn't declare that as income, we would probably be responsible. If we were a for-profit hospital, we would probably be responsible for tax fraud. But that's what I'm trying to get at, counsel. There are all kinds of accounting and other legal questions. The only thing before the board was, what amount did Dana-Farber actually have to pay in meeting its liability for this tax? And its liability was $20. It was liable for the whole $20. I understand you're going to put it on your books that way. But what the board was saying, you start out with $20 that you have to pay the state under the state law. But from this fund, where this tax money is going, you're actually going to get $5 million back. So, therefore, only pay us $15 million. What I'm trying to get at is the example is, in your view, deceptively simple. And I want to understand why. And I don't want to hear about how accountants put this on your books. Because, obviously, that's something in your control, not the Secretary's control. Your Honor, I hope I'm not being— Certainly, I'm not trying to be difficult or flippant in saying that the income has to be booked as income. Because it's payment for actual services received. And I think the barometer example is easier just because if that doctor didn't declare the $75 in income, there's no question the doctor would be guilty of tax fraud. If the doctor went around doing sort of bartering his services all over and then declared no income for the year, it would be tax fraud. Because it is income. Why is it income? It's because it's owed. I'm entitled to that. Dana-Farber is entitled to that payment. So is your argument that the example doesn't fit because the Secretary would be forcing your client to commit tax fraud? Well, if the hospital actually had to do its books the way the Secretary is saying, that would amount to— and Dana-Farber does not pay income tax. A for-profit hospital, though, would. If it was not counting that as income, that would be tax fraud. Where does the Secretary tell you how to keep your books? The Secretary doesn't. But this gets to the other point about treating two hospitals that are similarly situated differently. Now, just because I have merged the two hospitals, I'm not entitled to the income for having provided the exact same care to the exact same patients? I'm entitled to that under Massachusetts statutes. So if I don't book it as income, I've either committed tax fraud or, at the very least, I'm being denied what I am entitled to under the statute. And if I don't get the full compensation of Medicare cost reimbursement, as your Honor was saying before, somebody has to pick that up. Who would pick that up? It would have to be passed on to private payers because the hospital, a not-for-profit hospital is not earning a profit. So insurers, I mean, it's really when you unravel this whole case, is Medicare going to pick this up or will it be passed on to private insurers? Of course, the insurers are already paying their own share. I understand, but this will be a further cost passed on to the private insurers or Medicare. And the statute and the regulations both incorporate the no-cost-shifting principle. But it's the no-cost-shifting onto Medicare for expenses to run Medicare. Either way. The no-cost-shifting principle explicitly in the statute and the regulation is that Medicare won't pay the private charges and the private patients won't pay the Medicare share of the cost. So if the cost isn't being collected from the Medicare patients for their share, it has to be shifted onto the other patients. And if you, again, take the merger example, day one, before the merger, Medicare is paying its share. Day two, that Medicare reimbursement stops. But the hospital has to get the money somewhere. So they're going to have to charge their private patients more. It's a very clear cost. So some states, just so I understand this, do some states do this as a deduction rather than a separate payment? In other words, a deduction of the tax paid in rather than a separate payment? I don't know that they do it as a deduction. I do know, looking at the Illinois. But if they did, then you would acknowledge, although I'm not forcing you to concede anything, that's a different case and that's a stronger case for the secretary on saying this is not a cost actually incurred. Your point here is the way the state has structured it, it's too distinct. And I don't think it's just structuring. I think it's substance. There are sources that don't contribute. But the substance, I really wonder if it's really different because it's really the label the state puts on it. I understand your contrary point on that. But looking at the other cases that have been decided, certainly in Kindred and in the Abraham Lincoln case, it really was a case of hospitals were the ones contributing to the fund and the same hospitals were the ones getting the money back. And here we have a lot of other sources. In fact, the biggest contributors to the fund get nothing back because they're insurers. I'm not sure why that matters. In Abraham Lincoln, there was a specific provision that if you were an exempt organization, like you didn't have to pay tax in, you did not get any money back. Whereas here, we have exempt organizations, community health centers, that get money out, though they never put any money in because it's not a revolving door. It's a generally applicable tax, broadly based, that funds something that is critical to the state's manifesto. Can I ask another question, which is unrelated to my last question? On the law, again, suppose for me, because I think this is where I am, if the case comes down to is this a refund under the refund regulation, I think you win. But if I think that the source of authority here for Medicare is broader than just the refund regulation, then I think you have a problem. And the government says that it's not just the refund regulation, this is adjudication where the government can elaborate on, apply its general regulations to new situations. What is the problem with the government's theory on that point? Well, the board can only be affirmed on its own grounds. The board twice said, on page 49 and again on page 50, that it was finding that it was a refund. Those are the board's words. And so the board didn't say that it was something else, it said it was a refund. And I think that it's true that the board has authority in adjudication to kind of fill in these turstices in the regulations, but here are the regulations in this area. It says act as a refund. As a refund. Act as, not is a refund. Well, it has. I'm just looking at the actual language. Yeah. That's a JA 50. And that JA 49, they say in the third paragraph in their findings of fact and conclusions of law, that what controls are the statute in 413.9. Well, what I'm looking at is on page, likewise in the third paragraph, the board finds that the payments made to the UCP were properly treated as refunds. That's the paragraph before. I'm sorry, we were counting paragraphs differently. Yeah. So that's my understanding of what the board decided, that it was a refund. And even if the board has authority to fill in turstices, the regulations that talk similarly of discounts, chargebacks, refunds, they're all similar in the sense that they all are conditioned on their first being the expense, and then the expense is being reduced by the second thing. And again, I'm not relying exclusively on temporal nature. It's that direct conditional relationship. Whereas here, the payments are not conditional at all. We have recipients who receive money from the fund that don't make any contributions. We have the largest recipient, 160 million from the fund, paid 4 million into it. And we have hospitals that pay money into the fund and get nothing back. So there's not that conditionality. There's not that relationship. It's not any association. It's that association. And that's what I think the secretary was referring to when she said specifically to provide, you know, make whole or partly whole. All right. Anything further? Thank you very much. Thank you. All right. Counsel for Pillar? I just want to point out the language that Judge Rogers pointed out in the board's regulation. The payments here, the board explained, act as a refund. It then said that the treatment is consistent with the refund regulation, and the only things that it ever described as controlling were the statute and the more general regulatory provision that we cited, too. So we think that the board certainly was, and I would also ‑‑ Not the refund regulation is your point. It said it was analogous. It didn't say it used the language analogous. That one sentence that is cited by opposing counsel is not great for you. You don't have to say anything. I would just also note that to the extent that the board was also looking to the offset guidance, the offset guidance could not be clearer that it was saying that this type of treatment should be ‑‑ Is the guidance consistent with the regulation? I think it's sketchy in terms of being consistent with the regulation. The guidance is interpreting the statute, and the guidance says that it is that these payments are analogous to the refunds explained in 413‑98, the refund regulation. So I think that the guidance itself is quite clear that the closest analogy is the refund regulation in the existing regulations because, again, the secretary ‑‑ that is a regulation that's directed to goods and services. It's just ‑‑ it doesn't come up with the idea of collecting taxes and then handing them right back. You can look at what the board actually said where it quoted refunds of previous expense payments are reductions of the related expense. So it's not a ‑‑ was it Judge Kavanaugh or Judge Wilkins who started out saying these are not refunds in this sort of common day sense that you and I think of it where we pay a tax and we overpay it and then we get a refund. This is this refund term of art in this sort of board decision. I mean, you can take that and run with it, counsel. That's all I'm saying. No, no, sure. I mean, we do think it's clear that what the board is doing here is ‑‑ That's a softball. Anything further. I have one question, which is the ‑‑ isn't the reason that you did the guidance, not you personally, the government did the guidance rather than a new regulation was the retroactivity concern. In other words, that if they did a new regulation in 2010, it would be harder to apply that retroactively to refund. No, I don't think so. I mean, the timing of this is that after the first time that the board ever had occasion to address this sort of thing, when the first time it thought about the issue was the adjudication in Abraham Lincoln and after it issued that, it wanted to make sure that everybody was very clear on how it was interpreting this. I would just also note that we do think that the structures of the taxes in Abraham Lincoln and Breckenridge, I mean, there are obviously differences in the underlying state regimes, but the structure of those taxes are exactly the same as what we're talking about here, except that here it's even a clearer case, because here Massachusetts itself by regulation conducts the very offset that the secretary is conducting. And again, we think that the structures of the underlying taxes are the same, but the same as that addressed in the refund in the offset guidance. All right. And we think those decisions were correctly decided. Thank you. We'll take the case under advisement.
judges: Rogers, Kavanaugh, Wilkins